UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OCEANA, INC., <br><br> Plaintiff, <br><br> v. <br><br> PENNY PRITZKER, *et al.*, <br><br> Defendants. | Civil Action No. 13-770 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Oceana, Inc. brought this action under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, challenging procedural and substantive aspects of the National Marine Fisheries Service's at-sea monitoring program in its Northeast Multispecies Fishery. Oceana alleges that the Service's relatively lax monitoring plan was motivated by cost savings, not conservation, and that, as a result, it violates controlling law, including this Court's decision in Oceana, Inc. v. Locke, 831 F. Supp. 2d 95 (D.D.C. 2011). See Compl., ¶ 60. The Government, believing that the suit should be heard near the communities most affected by the Service's decision, now moves to transfer the case to the District of Massachusetts pursuant to 28 U.S.C. § 1404(a). Because the Court finds that convenience and the interests of justice justify keeping the matter in the District of Columbia, it will deny Defendants' Motion.

**I.     Background**

In recognition of the persistence of overfishing and habitat loss that threaten fish populations off the coasts of the United States, and with the aim of maintaining a balance between conserving fishery resources and promoting the American fishing industry, Congress

1

enacted the Magnuson-Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 *et seq.* The Act created eight Regional Fishery Management Councils to monitor and oversee multiple fisheries in each region's waters. 16 U.S.C. § 1852. Each Council is responsible for developing and maintaining a Fishery Management Plan for each fishery under its control. The Act imposes content requirements on these FMPs, see § 1853(a)(15), which must ultimately be approved by the National Marine Fisheries Service, acting on behalf of the Secretary of Commerce. See § 1854.

The Northeast Multispecies Fishery is a "mixed stock" fishery that includes 13 species of fish that live in the coastal waters off New England and the mid-Atlantic states. See Compl., ¶ 18. Some of these stocks include species that have been chronically overfished for years. See id., ¶ 19. In response, the Service enacted the Northeast Multispecies Fishery Management Plan, a federal scheme that regulates the management of twenty stocks of fish in New England. See id., ¶ 23. In 2009, the Service adopted Amendment 16 to the FMP, see id., ¶¶ 23-26, which was meant to end overfishing and to rebuild overfished stocks in the Northeast. It also expanded the Fishery's sector program, which limits the number of vessel groups that may fish in a given year. See id.

The Service has established procedures to adjust FMPs during the time between amendments. See Compl., ¶ 48. These procedures, known as "framework adjustments," are intended to allow the Government flexibility in managing fisheries without having to observe the full procedural requirements that otherwise apply to the adoption of new or significantly modified management measures. Id. Framework 48, one such adjustment, took effect on May 3, 2013, altering the process by which vessel groups could gain access to the areas cordoned off under the Northeast FMP. See Compl., ¶ 48; 50 C.F.R. § 648.87(c)(2)(i). According to Plaintiff,

the new Framework "allowed [the Service] discretion not to adequately monitor" the covered sectors. Compl., ¶ 54.

Oceana is "a non-profit international advocacy organization dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and public education." Id., ¶ 2. Although headquartered in Washington, D.C., Oceana claims "195,000 members around the world," id., who "use and enjoy the oceans for a variety of [recreational and commercial] activities" and are interested in the "consumption and commercial and recreational use of fish populations." Id., ¶ 5. Its members are harmed, Oceana alleges, by "unsustainable fishing practices in the Northeast fisheries" generally and by "the failure of the Fisheries Service to establish adequate catch monitoring systems and accountability measures" in particular. Id., ¶¶ 5-6.

In this suit, Oceana challenges two agency actions: (1) the Secretary's promulgation of Framework 48; and (2) her approval, pursuant to the new Framework, of an allegedly inadequate monitoring level for the 2013 fishing year. See id., ¶¶ 56-86. The challenged regulations relate directly to fisheries off the coast of New England, but the parties disagree sharply about whether the regulations will have broader effects. Compare Transfer Opp. at 6 ("Mismanagement of the Northeastern fisheries is not a 'Northeastern' problem; it is a national one.") with Transfer Mot. at 7 (noting "the local interest in deciding local controversies at home") (internal quotation marks omitted).

Although Defendants here also moved for summary judgment on the merits of Plaintiff's suit, they have separately brought this Motion to Transfer, contending that Massachusetts is the more desirable location for the resolution of this dispute.

## II. Legal Standard

Even if a plaintiff has brought its case in a proper venue, a district court may, "for the convenience of parties and witnesses, in the interests of justice . . . transfer [it] . . . to any other district or division where [the case] might have been brought." 28 U.S.C. § 1404(a). The only textual limitation on the Court's power to transfer a case under § 1404(a), then, is the requirement that the case "might have been brought" in the forum to which the defendant is seeking transfer. Van Dusen v. Barrack, 376 U.S. 612, 623 (1964). In other words, the transfer statute requires that venue be proper in the new forum.

Once that threshold condition is met, district courts have "discretion … to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen, 376 U.S. at 622); see also Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 53 (D.D.C. 2012). Courts in this circuit are instructed to consider motions to transfer venue favorably, given "[t]he danger that a plaintiff might manufacture venue in the District of Columbia . . . by naming high government officials as defendants . . . ." Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir.1993). Still, to prevail, the movant must show that "considerations of convenience and the interest of justice weigh in favor of transfer . . . ." Sierra Club v. Flowers, 276 F. Supp. 2d 62, 65 (D.D.C. 2003).

**III. Analysis**

A. Propriety of New Venue

Defendants argue – and Plaintiff does not contest – that this case could have been brought in the District of Massachusetts. The Court agrees. Under the general federal venue statute, venue in a suit against the federal government will lie in any district in which a substantial part of the events or omissions giving rise to the claim occurred. See 28 U.S.C. § 1391(e)(1)(C).

4

This dispute concerns the effects of Framework 48 and associated decisions, and federal officials in Gloucester, Massachusetts, were involved in writing and promulgating those rules. See Transfer Mot. at 2. Many of the fishermen affected by the challenged regulations, moreover, are located in Massachusetts, and the fish themselves populate the waters off the Bay State's coast. See id. Venue is thus proper in that district. See Trout Unlimited v. Dep't of Agric., 944 F. Supp. 13, 14 (D.D.C. 1996) (finding venue proper in the district of Colorado in a case concerning Colorado national forests); Nw. Forest Res. Council v. Babbitt, No. 93-1579, 1994 WL 908586, at *2 (D.D.C. Apr. 13, 1994) (finding venue proper in Western District of Washington for Endangered Species Act action involving West Coast marbled murrelet populations). Because this case could have been brought in Massachusetts, Section 1404(a)'s threshold requirement is satisfied.

  B. Private- and Public-Interest Factors

  This hurdle cleared, the Court must now decide whether the "particular circumstances" of the case "render [this] forum inappropriate." Starnes v. McGuire, 512 F.2d 918, 925 (D.C. Cir. 1974). Although "plaintiff's choice of forum is normally to be preferred," id. at 927, there is a "local interest in having localized controversies decided at home." Am. Dredging Co. v. Miller, 510 U.S. 443, 448 (1994) (internal quotation marks omitted). When plaintiffs bring suit in this district to challenge federal decisions affecting natural resources located in other jurisdictions, these principles come into tension.

  To reach a satisfactory conclusion, the Court must assess a number of private- and public-interest factors. See Trout Unlimited, 944 F. Supp. at 16. The private-interest factors include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses;

and (6) the ease of access to sources of proof. See id. The public interests relevant to this inquiry are: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in having local controversies decided at home. See id.

Although no single factor is dispositive in a motion to transfer, the totality of the considerations in this case counsels against granting the Government's Motion. Three of the six private-interest factors weigh against transfer, two are neutral between the two venues, and only Defendants' choice of forum supports sending the case to Massachusetts. Likewise, two of the public-interest factors are neutral, and despite the Government's sympathetic deference to the fishermen of Gloucester and other Northeastern towns, the third and perhaps most important consideration – the local interest in deciding local controversies at home – leads the Court to retain the case. Ultimately, the regulations at issue here are vital not only to commercial fishermen in Massachusetts, but to producers and consumers from Maine to North Carolina. In these circumstances, the Court finds transfer unwarranted.

### 1. *Private–Interest Factors*

#### a. Parties' Choice of Forum

The starting point of the private-interest inquiry under § 1404(a) is the parties' respective forum choices – the first and second factors in the transfer analysis. When a plaintiff brings suit in its forum of residence, it is "entitled to a strong presumption in favor of the chosen forum." Sierra Club v. Van Antwerp, 523 F. Supp. 2d 5, 11 (D.D.C. 2007); see also Greater Yellowstone Coalition v. Bosworth, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) (denying transfer where "two of the five plaintiffs . . . have offices in the District of Columbia"); Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 14 (D.D.C. 2000) (denying transfer where "[f]our of the [eight]

6

plaintiffs are headquartered in Washington, D.C. and two others have offices here"). That initial presumption applies here because Oceana is based in Washington, D.C., and has significant ties to the District. See Transfer Opp. at 4; Van Antwerp, 523 F. Supp. 2d at 11 (applying the presumption where the plaintiff "has its headquarters in the District of Columbia, and is thus clearly a resident of this District").

Chipping away at this bedrock principle, Defendants cite numerous exceptions to the "strong presumption" against transfer, but their arguments fail to strike home. The Government begins by arguing that transfer is appropriate because this district has "no meaningful ties to the controversy and no particular interest in the parties or subject matter." Transfer Mot. at 11 (citing Trout Unlimited, 944 F. Supp. at 17). That argument is unavailing, however, because the principle to which the Government adverts is relevant only in cases involving non-resident plaintiffs. Districts, in fact, are presumed to have an interest in suits involving their residents. See Trout Unlimited, 944 F. Supp. at 17. While the Government cites numerous cases to support its assertions, see Transfer Mot. at 11-12, just one of those cases involved a plaintiff who was a resident of the original forum, and that case was transferred only because the transferee district (Maryland) was adjacent to the original forum (Washington, D.C.), the defendants were located in the transferee district, and the plaintiff had been indicted there for defrauding the defendants. See id. at 11 (citing Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 6 (D.D.C. 1996)).

Even if the Government's argument were relevant to this case, moreover, it would fail on the substance. It is simply not true that this district has no meaningful connection to or interest in the controversy. Instead, the District's interest in this case is typical of cases involving federal regulations promulgated in the capital – cases in which courts have refused to authorize transfer. In Wilderness Soc'y v. Babbitt, for example, the court found a sufficient nexus to this city

7

because relevant public meetings and agency decisionmaking had occurred here and because the "Secretary [of the Interior] . . . signed the Record of Decision in the District of Columbia and briefed the public on his decision here." 104 F. Supp. 2d at 14; see also Greater Yellowstone v. Bosworth, 180 F. Supp. 2d at 128-29 (denying transfer where "federal government officials in the District of Columbia were involved in the [challenged] decision"); but cf. Flowers, 276 F. Supp. 2d at 68 ("[P]recedent in this circuit does not require or even encourage resolution in this forum of [Endangered Species Act] and other [federal] environmental claims. . . ."). This suit, similarly, challenges regulations that were promulgated by officials at agency headquarters in Washington, including 78 Fed. Reg. 25,591, 25,619 (Sector Operations Rule signed by Samuel D. Rauch III, Deputy Assistant Administrator for Regulatory Programs); and 78 Fed. Reg. 26,118, 26,153 (Framework 48 signed by Alan D. Risenhoover, Director, Office of Sustainable Fisheries). Furthermore, although the regulations' effects would perhaps fall most strongly in and around Massachusetts – and, as the Government concedes, Rhode Island and other Northeastern states – the economic impact would also be felt in mid-Atlantic fisheries close to Washington, not to mention in seafood markets around the country. See Transfer Opp. at 6.

The present case is also distinguishable from this Court's recent venue decision in Charleston Preservation Society. In that case, the Court acknowledged that a facial attack on statutes and regulations can have a connection to this district that counsels against transfer. See 893 F. Supp. 2d 49, 55. The Court granted transfer nonetheless, but only because the plaintiffs in that case were "merely bring[ing] an APA challenge to a decision by a local division of [a federal agency] with overwhelmingly local effects." Id. (emphasis added). This case, instead, involves a decision made at the headquarters of a federal agency with overwhelmingly regional – and perhaps even national – effects.

8

Plaintiff's choice of forum thus deserves substantial deference and counsels against transfer.

    b. Remaining Factors

The third factor, where the claim arose, weighs against the Court's sending this case to Massachusetts for many of the same reasons. An administrative claim is said to arise in this district if it was drafted, signed, and published in this district, and if the controversy "stems from the formulation of national policy on an issue of national significance." See Greater Yellowstone Coalition v. Kempthorne, Nos. 07-2111, 07-2112, 2008 WL 1862298, at *5 (D.D.C. 2008). Although Plaintiff admits that National Marine Fisheries Service staff in Massachusetts are generally involved in developing fishery decisions, the regulations at issue here were promulgated pursuant to authority belonging only to the Secretary, and the Secretary ultimately signed them. See Transfer Mot. at 5. The parties, furthermore, agree that the effects of the challenged regulations will be felt all along the eastern seaboard, even if Massachusetts will be affected the most. See id. This factor thus cannot support transfer.

The fourth factor – the convenience of the parties – tilts slightly against sending the case to Massachusetts. The Government cannot reasonably claim to be inconvenienced by litigating in this district. After all, this is its home forum (and, incidentally, Plaintiff's). See Compl., ¶¶ 7–9; Transfer Opp. at 10. Oceana, on the other hand, might be inconvenienced if forced to litigate in Massachusetts, since the organization has just one staff member in that district, see Transfer Opp. at 2-3, and it would be forced to retain local attorneys or have its own lawyers admitted *pro hac vice* there. See id. at 12. At the same time, because this is an APA case, it is unlikely that the parties or the lawyers for either side will have to appear in court often, and the minimal fees for *pro hac vice* admission are "not substantial enough" to tip the balance in a transfer case.

WildEarth Guardians et al. v. U.S. Forest Service, 2012 WL 1415378, at *4 (D. Colo. 2012). Insofar as the convenience of the parties involved in the case is germane to the Court's inquiry, then, that consideration weighs marginally against transfer.

The remaining private-interest factors – the convenience of witnesses and the ease of access to sources of proof – are similarly "not likely to be relevant here." Transfer Mot. at 12 n.7. Indeed, those two factors are "less relevant [to the transfer inquiry where] th[e] case involves judicial review of an administrative decision," Trout Unlimited, 944 F. Supp. at 18, and where the case will be decided on the basis of the administrative record, without discovery or in-court testimony. See Southern Utah Wilderness Alliance v. Norton (Southern Utah II), 315 F. Supp. 2d 82, 88 (D.D.C. 2004) (finding convenience of witnesses irrelevant where parties agreed case would be decided solely based on administrative record); Flowers, 276 F. Supp. 2d at 69 ("[T]he location of witnesses is not a significant factor" in judicial review of agency action.). To the extent that the convenience factors are relevant, though, they are unhelpful to Defendants. The Government does not (and cannot) argue, after all, that the administrative record would be more accessible in Massachusetts because even though some of the "documents that will comprise the administrative record were created" there, the record has already been filed in this district. See Notice of Lodging of Admin. Record, ECF. No. 15, July 25, 2013. These factors, accordingly, are neutral with respect to transfer.

A weighing of the private-interest factors, in sum, favors denying the Government's Motion.

    2. *Public–Interest Factors*

        a. Judicial Economy

The first two public-interest factors – the transferee court's familiarity with the governing

law and the relative congestion of the courts' calendars – are neutral with respect to transfer. As to the former, the Court sees no need to deviate from "the principle that the transferee federal court is competent to decide federal issues correctly." Flowers, 276 F. Supp. 2d at 70 n. 6 (quoting In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175 (D.C. Cir. 1987)) (internal quotation marks omitted). Still, that principle is not a trump card; when "both courts are competent to interpret the federal statutes involved [,] . . . there is no reason to transfer or not transfer based on this factor." Nat'l Wildlife Foundation v. Harvey, 437 F. Supp. 2d 42, 49 (D.D.C. 2006). Both Massachusetts and District of Columbia courts are experienced arbiters of MSA cases and of fishery disputes in general.

The Government argues that the District of Massachusetts "may be able to resolve [Plaintiff's] claims more efficiently" than this Court because a district judge there has previously adjudicated a case concerning Amendment 16. See Transfer Mot. at 10 (referring to City of New Bedford v. Locke, 2011 WL 2636863, at *1). Judges in this district, however, have themselves presided over a number of cases – indeed, all of the cases of which the Court is aware – challenging the Northeast Multispecies Fishery's monitoring requirements. See Transfer Opp. at 2. Even more to the point, this Court has issued a lengthy Opinion on Amendment 16 and the monitoring issues raised therein. See Oceana, 831 F. Supp. 2d 95. As a result, the Court cannot conclude that this factor favors transfer. See Greater New Orleans Fair Hous. Action Ctr. v. HUD, 723 F. Supp. 2d 14, 27 (D.D.C. 2010) (finding interests of justice weighed against transfer where district court was "familiar with the facts and legal issues raised," and had already issued two opinions on the subject).

In conjunction with courts' familiarity with the issues, cases have also considered whether transfer might lead to inconsistent results. See Van Dusen, 376 U.S. at 644; Pueblo v.

11

National Indian Gaming Comm'n, 731 F. Supp. 2d 36, 40 (D.D.C. 2010). Here, the Court's decision to adjudicate the case in this district would not risk results at odds with each other. The Government argues that the fisheries suit pending in Massachusetts – Massachusetts v. Pritzker, No. 13-11301 (D. Mass.) – is "related" to this action because the agencies "lodged the same administrative record" in both cases. See Transfer Reply at 7-8. The Court, however, should not override Plaintiff's choice of forum where the risk of inconsistent judgments is merely "speculative." Greater Yellowstone v. Kempthorne, 2008 WL 1862298, at *4.

The risk in this case is nothing more than that. Indeed, the Government concedes that the suits pending in Massachusetts and in this district are not identical, see Transfer Reply at 7-8, and it fails to point to any specific inconsistency in the potential results of the two cases. As the Government notes, the Massachusetts litigation is a challenge to catch limits and in fact has nothing to do with monitoring. See Transfer Reply at 8. Instead, the Government suggests that the various pending cases could affect its revenue and costs with respect to fishing regulation. See Transfer Reply at 8-9. The inconsistent results the Government points to, however, rest on speculation about what steps the Government itself will take in response to the rulings in these cases. That cannot be a basis for transfer.

Along the same lines, although statistics show that the District of Massachusetts resolves cases in seven and a half months on average while this district takes an average of nine months, the relative congestion of the two dockets appears comparable. See Transfer Mot. at 10-11; Transfer Opp. at 13. Absent a showing that either court's docket is "substantially more congested" than the other, this factor weighs neither for nor against transfer. Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 178 (D.D.C. 2009); see also Preservation Soc'y, 893 F. Supp. 2d at 57 (finding that when "relative congestion is comparable," judicial economy

12

factor not substantial enough to warrant transfer).

>b. Local Interest

This brings the Court to the third and "arguably most important" of the public-interest factors: the local interest in having local controversies decided at home. Southern Utah Wilderness Alliance v. Norton (Southern Utah I), 845 F. Supp. 2d 231, 237 (D.D.C. June 28, 2002); Pres Soc'y, 893 F. Supp. 2d at 57. That consideration, although compelling in the abstract, does not justify transfer in this case; on the contrary, the national interest in having national controversies decided where they arise wins the day.

The Government cites a number of cases and principles in an attempt to convince the Court that Massachusetts has a strong interest in the controversy. It begins by noting that in "'cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.'" Transfer Mot. at 7 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508-09 (1947)). It argues, along those lines, that "the people of coastal Massachussets have a compelling interest in having these issues decided at home." Id. at 8 (internal quotation marks omitted). "The communities of coastal Massachusetts," the Government continues, "are directly affected by the regulation of the Northeast multispecies fishery and the economies of the communities are highly dependent on the fishers who are directly regulated by the [regulations] at issue in this litigation." Id. at 9.

The question, however, is not whether the people of Massachusetts have an interest – even a strong one – in the outcome of this case. Instead, the Court must determine whether this is a "question[] of national policy or national significance." See Oceana v. Bureau of Ocean Energy Mgmt., No. 12-981, 2013 WL 4495129, at *3 (D.D.C. Aug. 23, 2013). Such questions, after all, "are quite appropriately resolved here (or, at least, no more appropriately resolved

13

elsewhere)." Id. at *4 In Greater Yellowstone Coal. v. Kempthorne, 2008 WL 1862298, for instance, the court denied transfer of a challenge to the regulation of recreational snowmobile use in Yellowstone National Park, explaining that "Plaintiffs' ties to the District of Columbia . . . and the national scope of the environmental issues at stake," among other factors, counseled against transfer, and that "[t]he management of the National Parks and the interpretation of federal environmental statutes are nationwide concerns," not localized controversies. Id. at *7. In Wilderness Society, 104 F. Supp. 2d 10, similarly, the court refused to transfer a challenge to the decision to begin oil and gas leasing in the National Petroleum Reserve in Alaska because the case was "not a local dispute affecting only the local residents of the Northern Slope of Alaska," but instead "affect[ed] a national energy reserve the management of which ha[d] received national attention." Id. at 17.

The Court understands that the citizens of Gloucester will be profoundly affected by the outcome of this case. Their opportunities to fish will grow if the Court upholds Framework 48 and the related programs; conversely, they will almost certainly have to scale back their activities if the various challenges are successful. The Court is not persuaded, however, that this is a "localized controversy" that may fairly be heard in Massachusetts and nowhere else, nor that the connections between Plaintiffs, this case, and this forum are so weak as to deprive Plaintiffs of their prerogative to choose where they will sue. Framework 48 and the associated federal rules affect the entire Northeast Multispecies Fishery, which covers the waters off five Northeastern states, of which Massachusetts is just one. Cf., e.g., Pres. Soc'y, 893 F. Supp. 2d at 57 (holding that transfer was appropriate in part because "it is the citizens of Charleston who will most clearly feel the effects of the [challenged] project"); Airport Working Grp. v. U.S. Dep't of Defense, 226 F. Supp. 2d 227, 232 (D.D.C. 2002) (granting transfer because the challenged

14

decision "affects only the local citizenry" in Orange County). Commercial fishermen in the covered area, moreover, supply a national market for staple fish species. See Transfer Opp. at 6. The supply of those species – and thus their market price – will no doubt be influenced by the Service's sectors and quotas. See id. In addition, and perhaps unsurprisingly, Northeast fish do not always remain in the Northeast Multispecies Fishery; they migrate throughout the region and into other fisheries, including the Mid-Atlantic Fishery, which sits far closer to Washington, D.C., than to Massachusetts. See id. Depletion of stocks in the Northeast Multispecies Fishery will thus directly affect the marine ecosystem along the entire eastern seaboard. In short, management of the Northeastern fisheries is not just a Northeastern problem; it is a national one.

The Government responds by citing several cases from this district granting transfer. In each of those cases, however, the court's decision rested on factors not present here. Defendants argue, for example, that this Court's decision in Preservation Society of Charleston, 893 F. Supp. 2d 54, stands for the proposition that a suit with significant ties to the transferee District – and no meaningful nexus with the District of Columbia – merits transfer. See Transfer Mot. at 9. They contend, similarly, that this Court should be persuaded by Sierra Club v. Flowers, which rejected the plaintiffs' argument that venue should lie in the District of Columbia because the Florida Everglades are an "American treasure" of national interest. See Transfer Mot. at 9 (citing 276 F. Supp. 2d 62).

Neither case, however, presented facts sufficiently comparable to those in this case. In addressing the motion to transfer in Preservation Society, the Court began by observing that the plaintiffs had "significant ties" to Charleston and that their claim of potential harm to Charleston's historic district was "overwhelmingly local in nature." 893 F. Supp. 2d at 54, 57. The Court also noted that the rule in question had come from the defendant's Charleston office

and that officials in Washington had not been involved. It observed, further, that the rule would be contingent upon the outcome of a parallel state process. Id. at 58. Finally, it made repeated reference to the fact that the plaintiffs were based in South Carolina. See id. at 59 (case citations "d[id] not help Plaintiffs in their effort to reframe an entirely local controversy into one of such national scope that it demands to be heard outside of their home forum"). Oceana, on the other hand, has few ties to Massachusetts – and much less significant ones. Indeed, the organization has just one staff member there. See Transfer Opp. at 12. The rules in question in this case, furthermore, were signed and promulgated in Washington, and Oceana seeks to prevent a harm that is alleged to be national in scope. See id. at 6-7. The Government thus cannot overcome the presumption in favor of litigating in this forum on the basis of Preservation Society alone.

Flowers is no more helpful to the Government. The court granted transfer in that case not because of the transparently weak "American treasure" argument, but because of the "lack of evidence" that federal officials in this district had played an "active or significant role" in the decision to issue environmental permits affecting the Everglades. See 276 F. Supp. 2d at 67 (quoting Airport Working Grp., 226 F. Supp. 2d at 230). The court pointed out that the relevant record of decision had been signed by officials in Florida and that there was "no Washington-level involvement" in the decisionmaking process. Id. at 68. Here, by contrast, Oceana is challenging rules promulgated and signed under the Secretary's statutory authority. See 16 U.S.C. § 1855(d). The Government attempts to head off this argument by noting that the agency that is "primarily responsible" for developing those rules is located in Gloucester. See Transfer Mot. at 8-9. Oceana concedes that regional agency officials develop many fishery actions and decisions but counters that the regulations it challenges in this suit were promulgated pursuant to authority belonging solely to the Secretary, outside of the ordinary process. See Transfer Opp. at

16

5. In fact, Oceana's Complaint is premised in part on the claim that the changes to Amendment 16's monitoring standards were unlawfully promulgated by the Secretary. The Government points to no evidence in the record – nor, indeed, anything beyond the conclusory declarations in its Transfer Motion and Reply – to rebut Plaintiff's argument.

Finally, the Government cites several cases involving land resources to support transfer. See Transfer Mot. at 8-9 (citing Trout Unlimited, 944 F. Supp. 13; Southern Utah II, 315 F. Supp. 2d 82). Each of those cases, however, turned wholly or principally on that fact that the resources were "located entirely within" the proposed transferee district, see Trout Unlimited, 944 F. Supp. at 17-18, or that land and resources are of particular interest to the state in which they are found. See Southern Utah II, 315 F. Supp. at 87-88. Neither principle can be applied to this case: the Atlantic Ocean does not belong to Massachusetts, the fish that would be affected by the challenged regulations swim in the waters off at least five Northeastern states, and the Government concedes that numerous states all along the East Coast have an interest in the treatment of those resources. See Transfer Mot. at 8-9. The Court, therefore, must conclude that this factor tips in Plaintiff's favor.

## IV. Conclusion

"[P]laintiff's choice of forum is normally to be preferred," Starnes, 512 F.2d at 927, and here it will be, as the great weight of both the public- and private-interest factors supports keeping this case in the District of Columbia. The Court does not deny that the people of Massachusetts have a clear interest in the outcome of this case. That interest, however, does not outweigh the strong presumption in favor of Plaintiff's choice of its home forum. This is especially so where the challenged decisions involved federal agency staff in Washington, and where the concrete effects of those decisions will be felt nationally. With only Defendants'

choice of forum weighing against transfer, the Court declines to transfer the case "in the interest of justice." 28 U.S.C. § 1404(a).

The Court, therefore, will deny the Government's Motion to Transfer the case to the United States District Court for the District of Massachusetts. An Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: October 28, 2013