**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

OCEANA, INC.,

     Plaintiff,

     v.                                                     Civil Action No. 13-770 (JEB)

PENNY PRITZKER, *et al.*,

     Defendants.

<u>**MEMORANDUM OPINION**</u>

The Magnuson-Stevens Fishery Conservation and Management Act of 1976 balances the twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive. To further those ends, the Act sets forth a detailed regulatory scheme that engages both the Secretary of Commerce – through her delegate, the National Marine Fisheries Service – and eight regional Fishery Management Councils in overseeing the harvest of our nation's oceans. The Service and Councils manage fisheries largely through Fishery Management Plans, which help to set caps on catch and outline procedures for monitoring commercial fishing. Those Plans are kept current through Plan Amendments, which go through a lengthy approval process and can enact major changes, and Framework Adjustments, which are expedited alterations that modify Plans and ensure that fisheries benefit from up-to-the-minute innovations and data.

Oceana, a conservation organization and Plaintiff in this case, challenges a recent Framework Adjustment and related regulation. Framework 48 altered the details of a New England fishery program that sends third-party observers onto vessels to collect data on catch. The Sector Operations Rule, as a corollary, set the coverage level for observers at 22% of trips in the 2013 fishing year. In its lawsuit and current Motion for Summary Judgment, Oceana first

claims that the Framework Adjustment contravenes the mandates of the Northeast Multispecies Fishery Management Plan, suffers from procedural flaws, and violates the directives of both the Magnuson-Stevens Act and the Administrative Procedure Act. Plaintiff further argues that the Sector Operations Rule sets an unreasonably low coverage level and violates the APA. Defendants, which include the Service, the Secretary of Commerce, and the National Oceanic and Atmospheric Administration, disagree and have cross-moved for summary judgment. Although the issues require some fairly technical analysis, the Court ultimately rules for the Service, finding that its actions were well reasoned and are consistent with governing law.

## I.    Background

At bottom, this case is about whether the National Marine Fisheries Service is providing sufficient monitoring to ensure that commercial fishers stick to their allotted catch limits. Oceana alleges that the current regulations do not clear that bar and instead prioritize cost over conservation. The Service takes an opposing view. A warning to uninitiated readers: to understand Plaintiff's contentions and the Service's response, some basic background on fishing regulation is necessary. That is where the Court begins.

The persistence of overfishing in U.S. waters led Congress to enact the Magnuson-Stevens Act, Pub. L. No. 94-265, 90 Stat. 352 (1976), amended by Pub. L. No. 109-479, 120 Stat. 3575 (2007). That Act aims, *inter alia*, to "conserve and manage [U.S.] fishery resources," "promote domestic commercial and recreational fishing under sound conservation and management principles," and "provide for the preparation and implementation, in accordance with national standards, of fishery management plans . . . [to] achieve and maintain . . . the optimum yield from each fishery." 16 U.S.C. § 1801(b).[1] The Act tasks the Secretary of

---

[1] Title 16 of the U.S. Code was in the process of revision for the 2012 edition at the time of briefing, a

Commerce with the pursuit of those goals, and the Secretary has in turn delegated her responsibility to the National Marine Fisheries Service.  See id. § 1802(39); Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 101 (D.D.C. 2011).  In addition, the Act sets up eight regional Fishery Management Councils, each of which monitors and oversees certain fisheries under its control.  See 16 U.S.C. §§ 1852(a), (h).  Together, the Service and the Councils act to address imbalances in aquatic ecosystems.

The Councils' and Service's efforts are guided by individual Fishery Management Plans. Each Council must develop and maintain a Plan for each fishery under its control, which then must be approved by the Service.  Id. §§ 1852(h), 1854(a).  Plans must be consistent with the requirements of the Act and, specifically, with the Act's ten National Standards, see id. §§ 1853(a), 1854(a), which require the Council and the Service to balance competing goals such as "prevent[ing] overfishing while achieving" an "optimum yield from each fishery."  See id. § 1851(a).  To keep Plans up to date, the Councils and the Service occasionally publish Amendments, which alter Plans in broad strokes, see id. § 1854(a), and Framework Adjustments, which are expedited changes that modify Plans in more modest ways.  See id. §§ 1853(c), 1854(b); 50 C.F.R. § 648.90(c).

In this case, Oceana is suing the Service and other government Defendants over a Framework Adjustment to the Northeast Multispecies Fishery Management Plan,[2] as well as a related regulation.  That Plan was authored by the New England Fishery Management Council and controls a substantial amount of fishing off the nation's northeast coast.  See New England Fishery Management Council, Summary of Northeast Multispecies Fishery Management Plan,

---

process that has recently been completed.  To avoid confusion, the Court uses the version of the Code cited in the briefs – the 2006 edition.

[2] For simplicity, the Court refers to the NMFMP and its periodically enacted amendments, which numbered 17 at the time of briefing, collectively as "the Plan."

<u>available at</u> http://www.nefmc.org/nemulti/summary/large_mesh_multi.pdf.  The Plan regulates

the region's "groundfish" fishery, which covers 13 different species of fish, such as cod,

haddock, and flounder, divided into 19 stocks.  <u>See</u> Framework Adjustment 48 at 154 (AR

26,195).  Among other things, the Plan contains a mechanism for determining an Annual Catch

Limit (ACL) for each stock in the fishery.  <u>See</u> Amendment 16 Final Rule, 75 Fed. Reg. 18,262,

18,266-71 (April 9, 2010).  The Plan also outlines mechanisms for the Service to monitor and

enforce those ACLs to prevent overfishing.  <u>See</u> <u>id.</u>

  The fishery is governed by a sector system, which is now the primary means of allocating

groundfish catch.  Sectors are "temporary, voluntary, fluid associations of vessels" that share an

apportionment of certain stocks of fish.  <u>Id.</u> at 18,275.  Fishermen who do not join a sector may

continue to fish as part of the "common pool," which carries its own limitations.  <u>See</u>

Amendment 16 at 99-100 (AR 480-81).  Fishermen who do join sectors, however, agree to abide

by certain fishing restrictions and work together to manage their annual share of each stock of

fish, known as the sector's Annual Catch Entitlement (ACE).  <u>See</u> <u>NOAA Fisheries Service Fact</u>

<u>Sheet: Answers to Commonly Asked Sector Management Questions</u> 1 (2009), <u>available at</u>

http://www.nero.noaa.gov/sfd/sectordocs/Sector%20Management%20Fact%20Sheet%

20Aug% 2009.pdf.  Each ACE for a given stock of fish represents a portion of the fishery's total

ACL for that stock, and by monitoring ACEs, the Council ensures that the fishery's overall limit

is not exceeded during the fishing year.  <u>See</u> Amendment 16 at 101-02 (AR 482-83).  Due to the

sector system's advantages over the common pool, most permit holders have joined sectors and

98% of fish are caught through that system.  <u>See</u> 2010 Sector Operations Final Rule, 75 Fed.

Reg. 18,113, 18,114-15 (Apr. 9, 2010); Framework Adjustment 48 at 156 (AR 26,197).

To ensure compliance with their ACEs for each stock, sectors are required to monitor and report on their overall catch. See 2013 Sector Operations Plans Interim Final Rule, 78 Fed. Reg. 25,591, 25,606 (May 2, 2013). This includes submitting reports to the Service on a weekly basis, which are corroborated by data from dealers purchasing fish from sectors. See id. A sector must submit daily reports once it approaches its ACE for any given stock. See id. The catch reported consists of a sector's "landings" – that is, fish that are caught and later sold – as well as "bycatch." See id. The term "bycatch" means discards –"fish which are harvested in a fishery, but which are not sold or kept for personal use." 16 U.S.C. § 1802(2). Discards are estimated for each sector using a "discard rate" that the Service calculates using data from paid third-party observers. See Amendment 16 at 109-10 (AR 490-491). Those estimated discards are added to the landings to monitor how close the sector is to reaching its ACE for a given stock. See id.

The Act requires each Plan to contain a Standardized Bycatch Reporting Methodology or SBRM – a system for reporting and estimating bycatch. See 16 U.S.C. § 1853(a)(11). The Council, per its groundfish Plan, tracks and estimates bycatch through two main programs. First, there is the Northeast Fisheries Observer Program (NEFOP), which operates in multiple fisheries and monitors catch and bycatch for both sector ships and the common pool. See 78 Fed. Reg. at 25,606; see also NEFOP, MRAG Americas, http://www.mragamericas.com/observer-programs/ northeast-fishery-observer-program (last visited Feb. 14, 2014). That program sends government-funded on-board observers to monitor the operation of fishing vessels at sea. See SBRM Amendment § 4.5, available at http://nero.noaa.gov/mediacenter/2013/09/2013 nersbrmdraftamendment.pdf. The NEFOP is governed by the SBRM Amendment to the Plan, which outlines specific statistical tools used to estimate bycatch. See id. § 5.1. Observers are allocated to vessels at a level that ensures that enough data is collected to meet the SBRM's

performance standard for the fishery as a whole.  See id., § 6.2.3. That standard is expressed in

terms of statistical precision: bycatch estimates must be "sufficient to attain a [coefficient of

variation (CV)] of no more than 30 percent."  Id., § 6.3.2.

The 30% CV standard is designed "to ensure that the bycatch-related data collected under

the SBRM and utilized in stock assessments and management is adequate for those tasks."  Id.

In general, CVs measure how far sample numbers usually deviate or vary from the average

sample, although the Service's calculation differs slightly from the standard CV formula.  See

Framework Adjustment 48 at 387 (AR 26,428).  Still, the Service's CV calculation aims to

measure how widely the samples of discards fluctuate and whether they are precise enough to

yield valid estimates of bycatch.  Taking more samples, of course, should increase the precision

of estimates.  This year, 8% of trips must be observed by NEFOP to meet the CV standard.  See

78 Fed. Reg. at 25,597.

The second program that tracks bycatch is specifically designed for sector vessels in the

groundfish fishery and provides coverage in addition to NEFOP.  See id. at 25,606.  That

program, known as the At-Sea Monitoring (ASM) program, lies at the heart of this case.  The

ASM program was first outlined by the Council in Amendment 16 to the Plan, which created the

program and mandated that it, too, meet the 30% CV standard.  See Amendment 16 at 109 (AR

490) ("minimum coverage levels must meet the coefficient of variation in the Standardized

Bycatch Reporting Methodology").  Amendment 16 stated that the "primary goal of observers or

at-sea monitors for sector monitoring is to verify area fished, catch, and discards by species, by

gear type."  Id.  Although coverage levels must meet a 30% CV, "[t]he required levels of

coverage will be set by" the Service each year, based on relevant data, "and may consider factors

other than the SBRM CV standard when determining appropriate levels."  Id.  In any event,

"[l]ess than 100% electronic monitoring and at-sea monitoring observation will be required." Id. Amendment 16 offered only those broad guidelines for the program, and it otherwise left sectors and the Regional Administrator to determine the details of monitoring. Id. at 110 (AR 491). In a (too) long Opinion in 2011, this Court largely upheld Amendment 16 after Oceana had filed suit. See Locke, 831 F. Supp. 2d 95.

Framework 48, which Plaintiff challenges in this case, was designed to flesh out and clarify Amendment 16's ASM program, among other things. The Framework contains two major changes highlighted by Oceana. First, it sets out specific goals and objectives for monitoring programs beyond merely "verify[ing] area fished, catch, and discards by species, by gear type." Amendment 16 at 109 (AR 490); see Framework 48 at 49-50 (AR 26,090-91). Second, it specifies what cut of data – i.e., which group of discard estimates – the CV standard applies to. See id. at 50-51 (AR 26,091-92). The lingering question left open in Amendment 16 was whether the standard applied to each stock of fish for the fishery as a whole, or to each stock of fish caught by each sector, or to some other slice of data. In Framework 48, the Council determined that the CV should apply at the broader stock level rather than to each sector's catch of that stock. See id.

After Framework 48 had clarified those details of the ASM program, the Service issued its 2013 Sector Operations Rule, which set the overall observer coverage level at 22% of all sector trips for the 2013 fishing year, which covers fishing from spring 2013 to spring 2014. See 78 Fed. Reg. at 25,597; 50 C.F.R. § 648.2. This was a lower level than the 38% level set for 2010 and 2011 and the 25% level set for 2012. See 75 Fed. Reg. at 18,126; 78 Fed. Reg. at 25,597; Summary Report at 2 (AR 25,798); Pl. Mot. at 7. Ultimately, that means that the Service

plans to fund an additional 14% ASM coverage beyond the 8% provided by the NEFOP. See 78 Fed. Reg. at 25,597.

Plaintiff contends that Framework 48 and the Sector Operations Rule are inconsistent with Amendment 16, improperly promulgated, inconsistent with the Magnuson-Stevens Act, and arbitrary and capricious. After Oceana filed its Complaint, the Government moved to transfer this case to the District of Massachusetts, a motion that the Court ultimately denied. See Oceana, Inc. v. Pritzker, No. 13-770, 2013 WL 5801755 (D.D.C. Oct. 28, 2013). Plaintiff has moved and Defendants have cross-moved for summary judgment; the Court now turns to those Motions.

## II.    Legal Standard

The Magnuson-Stevens Act incorporates the Administrative Procedure Act's familiar "arbitrary and capricious" standard of review. See 16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A). Because of the limited role federal courts play in reviewing such administrative decisions, the typical Federal Rule 56 summary-judgment standard does not apply to the parties' dueling Motions. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005)). Instead, in APA and MSA cases, "the function of the district court is to determine whether or not . . . the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). Under this "narrow" standard of review – which appropriately encourages courts to defer to the agency's expertise, see Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) – an agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation marks omitted). In other words, courts "have held it an abuse of discretion for [an agency] to act if there is no evidence to support the decision or if the decision was based on an improper understanding of the law." Kazarian v. U.S. Citizenship and Immigration Services, 596 F.3d 1115, 1118 (9th Cir. 2010).

It is not enough, then, that the court would have come to a different conclusion from the agency. See Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 841 (9th Cir. 2003). The reviewing court "is not to substitute its judgment for that of the agency," id., nor to "disturb the decision of an agency that has examine[d] the relevant data and articulate[d] . . . a rational connection between the facts found and the choice made." Americans for Safe Access v. DEA, 706 F.3d 438, 449 (D.C. Cir. 2013) (internal quotation marks and citation omitted). A decision that is not fully explained, moreover, may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

In cases involving expert scientific judgment, courts employ a particularly high level of deference. When examining an agency's "predictions, within its area of special expertise, at the frontiers of science," the "reviewing court must generally be at its most deferential." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). In addition, courts pay agencies "an extreme degree of deference" when decisions "involve complex judgments

about sampling methodology and data analysis that are within the agency's technical expertise." Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin., 476 F.3d 946, 956 (D.C. Cir. 2007) (internal quotation marks and alterations omitted); see also Int'l Bhd. of Teamsters v. U.S. Dept. of Transp., 724 F.3d 206, 216 (D.C. Cir. 2013) ("in light of the degree of deference we give to the agency's statistical methodology, we cannot conclude that the program will yield invalid findings"). In other words, when an agency talks scientific data, courts listen. As long as the ultimate decision is reasonable and reasonably explained, that decision will stand.

## III. Analysis

Plaintiff challenges the Service's actions on several grounds. It alleges (1) that Framework 48 is inconsistent with Amendment 16 and was improperly promulgated, (2) that it violates the Magnuson-Stevens Act, and (3) that it contravenes the APA. In addition, Oceana contends (4) that the 2013 Sector Operations Rule cannot withstand APA review. The Court addresses each issue in turn.

### A. Authority to Modify Amendment 16 Through Framework 48

Oceana first assails the Service's authority to modify Amendment 16's ASM program though Framework 48. In particular, Plaintiff targets two sections of Framework 48: the Goals and Objectives Regulation, which outlines broad objectives for the monitoring programs, and the Minimum Coverage Regulation, which specifies a baseline for statistical precision for the ASM program. Oceana last points out a purported procedural flaw with the regulations executing Framework 48. Each of these three points is considered separately.

#### 1. *Goals and Objectives*

The Magnuson-Stevens Act allows the Council to propose regulations "making modifications" to a Plan or Plan Amendment as necessary or appropriate, 16 U.S.C. § 1853(c),

which will be enacted as long as the modifications are "consistent with the fishery management plan," Plan Amendments, and other law.  Id. at § 1854(b).  Oceana identifies two purported flaws with Framework 48's Goals and Objectives Regulation.  First, Plaintiff argues that the Goals and Objectives Regulation does not merely "modify" Amendment 16, as the Magnuson-Stevens Act permits.  Instead, Oceana alleges that the goals trigger a fundamental shift in the current monitoring programs.  Second, Plaintiff contends that the new goals provision is not "consistent" with Amendment 16, as the Act requires.

Addressing the first argument, the Court must decide whether the addition of a Goals and Objectives section was more than a mere "modification."  The Supreme Court has held, in a similar context, that the word "modify" carries "a connotation of increment or limitation" – it "means to change moderately or in minor fashion."  MCI Telecomm. Corp. v. AT&T, 512 U.S. 218, 225 (1994).  It does not encompass a "radical or fundamental change" that would alter the basic workings of a regulatory program.  Id. at 229; see id. 226-29 & n.2.

In determining whether the new goals section represents a "fundamental change" to the Plan as a whole and Amendment 16 in particular, it is important to understand the monitoring provisions of that Amendment in context.  To begin with, the monitoring requirements in the Amendment – especially concerning ASM – comprise something of a skeleton waiting to be fleshed out.  The Amendment does not have a goals section for the monitoring programs in particular, although it does state broadly that the "primary goal of observers or at-sea monitors for [ASM] monitoring is to verify area fished, catch, and discards by species, by gear type."  See Amendment 16 at 109 (AR 490).  There is, however, a goals section for the Amendment as a whole, which contains aims such as "achiev[ing] goals of economic efficiency and biological conservation" that would apply to the monitoring programs as well.  Id. at 67 (AR 448).  Beyond

the single goal specific to the ASM program, the Amendment adds only a few relevant specifics about monitoring, dictating that minimum coverage levels meet the 30% CV standard but adding that the Service "may consider factors other than the SBRM CV standard when determining appropriate levels." Id. at 109 (AR 490).

With that context, the Court turns to the new Goals and Objectives Regulation contained in Framework 48. The regulation outlines six goals for the monitoring programs: to (1) "Improve documentation of catch," (2) "Reduce cost of monitoring," (3) "Incentivize reducing discards," (4) "Provide additional data streams for stock assessments," (5) "Enhance safety of monitoring program," and (6) "Perform periodic review of monitoring program for effectiveness." Framework 48 at 49-50 (AR 26,090-91). Most of these goals contain two or three elaborating objectives. For example, objectives aimed at improving the documentation of catch include determining "total catch and effort, for each sector and common pool, of target or regulated species" and achieving a "coverage level sufficient to minimize effects of potential monitoring bias to the extent possible while maintaining as much flexibility as possible to enhance fleet viability." Id. at 49 (AR 26,090).

Oceana contends that adding a new goals section to the regulations governing observer monitoring can hardly be considered a "modification," especially where several of the goals are novel or might reorient the programs. The Court believes, on the contrary, that fleshing out the monitoring programs by clarifying their goals may properly be considered a moderate or incremental change. Although the Goals and Objectives Regulation added some new language and indeed a new sub-section to the Code of Federal Regulations, none of the goals is truly novel, and none would reorient the monitoring programs.

To begin with, many of the goals listed in Framework 48 already existed in Amendment 16, albeit not neatly assembled into one pertinent section. The Amendment already set forth at least one aim of the ASM program, stating that the "primary goal of observers or at-sea monitors" is "to verify area fished, catch, and discards by species, by gear type." Amendment 16 at 109 (AR 490). This, of course, is translated into the primary goal under Framework 48 – "Improve documentation of catch" – as well as certain other goals, such as providing "additional data streams for stock assessments." Framework 48 at 49-50 (AR 26,090-91). The Amendment, moreover, noted that the Service "may consider factors other than the SBRM CV standard when determining appropriate levels" of monitoring. Amendment 16 at 109 (AR 490). The additional goals may properly be thought of as an elaboration of those other factors, which will guide the level of monitoring from year to year. This seems to be a modest embellishment of the prior regulation, as opposed to a "radical or fundamental change."

Of further note, none of the considerations outlined in Framework 48 is new to the Service's regulatory scheme. While the monitoring programs did not previously have their own goals section, Amendment 16 as a whole did, and many of the sub-goals that now apply to the monitoring programs echo those overarching, pre-existing goals. For example, Plaintiff makes much of the fact that the new goals consider cost. But Amendment 16's overall goals also considered cost, demanding that the program as a whole "achieve goals of economic efficiency" and "[m]inimize, to the extent practicable, adverse impacts on fishing communities." Amendment 16 at 67 (AR 448). Given that background, the updated Framework goal aimed at reducing the "cost of monitoring" – including balancing actual costs against the "opportunity costs of insufficient monitoring" – simply echoes Amendment 16's existing goals. Framework 48 at 49-50 (AR 26,090-91).

The Magnuson-Stevens Act, moreover, requires all Plans, "where practicable," to "minimize costs and avoid unnecessary duplication" and, "to the extent practicable," to "minimize adverse economic impacts on [fishing] communities." 16 U.S.C. § 1851(a)(7), (8). It can hardly be a "radical or fundamental change" for a regulation to simply comport with the governing Act.

Oceana's second contention – that Framework 48 is not "consistent with" Amendment 16 because it prioritizes cost over conservation – is similarly flawed. See 16 U.S.C. § 1854(b) (new regulations must be "consistent with" Plan); see also 50 C.F.R. § 648.90 (allowing "adjustments" to Amendment 16); Pl. Mot., Exh. 2 (Informal Guideline for Preparing Framework Fishery Management Plans and Amendments (May 20, 1982)) at 2 (forbidding "radical[] changes" and similar inconsistencies). As the Court has noted, the governing Act not only permits, but also requires, the Service and the Councils to take cost into account, as does Amendment 16. See 16 U.S.C. § 1851(a)(7), (8)(a); Amendment 16 at 67 (AR 448). Although the Service agrees that it may not consider cost at the expense of conservation, see 50 C.F.R. § 600.345(b)(1) (cost considered only "where two alternatives achieve similar conservation goals"), nothing in the Goals and Objectives regulation prioritizes economics over environmental preservation. In fact, most of the goals deal with making the program as effective as possible, and the first goal remains improving "documentation of catch," which will assist the Service in enforcing catch limits to protect the fishery's ecosystem. The Goals and Objectives Regulation, then, permissibly "modifies" and is "consistent with" Amendment 16. 16 U.S.C. §§ 1853(c), 1854(b).

### 2. *Minimum Coverage Regulation*

Oceana also argues that Framework 48's Minimum Coverage Regulation is not "consistent with" Amendment 16. Id. at § 1854(b). Amendment 16 originally specified

14

coverage levels as follows: "For observer or at-sea monitor coverage, minimum coverage levels must meet the coefficient of variation in the Standardized Bycatch Reporting Methodology." Amendment 16 at 109 (AR 490). The Minimum Coverage Regulation, by contrast, now states that "coverage levels must be sufficient to at least meet the coefficient of variation specified in the Standardized Bycatch Reporting Methodology <u>at the overall stock level</u> for each stock of regulated species and ocean pout, <u>and to monitor sector operations, to the extent practicable, in order to reliably estimate overall catch by sector vessels</u>." 50 C.F.R. § 648.87(b)(1)(v)(B)(1)(i) (emphasis added). Plaintiff alleges that the addition of the phrase "at the overall stock level" is inconsistent with Amendment 16, which in its view required precision at the 30% CV level for data <u>by sector</u>, not just by stock. Oceana further contends that the requirement to "reliably estimate overall catch by sector vessels" is not an adequate substitute for additional accuracy requirements previously contained in Service regulations.

Addressing the CV issue first, one fact is obvious from even the most searching reading of Amendment 16: it is completely and totally ambiguous as to what segment of data must meet the 30% CV standard. Oceana argues strenuously that it must be applied at the sector level, which would yield a fairly small cut of data and would thus require more coverage to assure greater precision (*i.e.*, because the sample size would be smaller if the data were divided by both stock and sector, more observation would be necessary to collect enough data to meet the CV standard). In fact, a sector-based standard would require so much coverage that the program would be forced to observe nearly 100% of trips. <u>See</u> Summary Report at 8 (AR 25,804). Much as Plaintiff yearns for this level of oversight, it simply has no textual hook. Amendment 16 stated plainly that "minimum coverage levels must meet the coefficient of variation in the Standardized Bycatch Reporting Methodology" – full stop. Amendment 16 at 109 (AR 490). It

is not inconsistent with that text for the Council to specify a particular segment of data to which the SBRM applies. Indeed, the Service claims that allowing the regulation to stand as written would cause confusion. That position seems entirely reasonable, given the very real controversy between Defendant, which would apply the CV standard to an entire stock of fish and require monitoring on less than a quarter of trips, and Oceana, which would apply the CV standard by sector and require monitoring on almost all trips. Because the Service merely clarified an ambiguity by approving the Minimum Coverage Regulation, the regulation is properly characterized as an adjustment "consistent with" the Amendment. See 50 C.F.R. § 648.90 (a)(2)(iii) (listing "conditions and measures" that "may be adjusted through future framework adjustments"); see also Informal Guideline for Preparing Framework Fishery Management Plans and Amendments 2 (May 20, 1982) (limiting the scope of Framework Adjustments).

In addition, Oceana bemoans the deletion of language requiring the program to "accurately monitor sector operations." 50 C.F.R. § 648.87(b)(1)(v)(B)(3)(ii) (2011). This deletion, it contends, renders the new regulation inconsistent with Amendment 16 – despite the fact that Amendment 16 itself did not contain this language; rather, it appears only in the Amendment's implementing regulations. See Locke, 831 F. Supp. 2d at 112 n.2. Even assuming that the deletion of language that appears only in a regulation could cause an inconsistency, the Service appears to have merely substituted language specifying that coverage must be sufficient "to monitor sector operations, to the extent practicable, in order to reliably estimate overall catch by sector vessels." 50 C.F.R. 648.87(b)(1)(v)(B)(1)(i). The Court sees no great difference between "accurately" and "reliably" monitoring sectors, and Plaintiff has offered none. The new goals section, moreover, reiterates the need to accurately determine catch, as do Framework 48 itself and the preamble to its implementing regulation. See Framework 48 at 50

(AR 26,091) (objective to "[c]ollect information by gear type to accurately calculate discard rates."); id. ("Adequate coverage (combined NEFOP, ASM and EM) is required to meet the need for both the precision and accuracy of discard estimates."); 78 Fed. Reg. at 26,129-30 ("The level of observer coverage, ultimately, should provide confidence that the overall catch estimate is accurate enough to ensure that sector fishing activities are consistent with National Standard 1 requirements to prevent overfishing while achieving on a continuing basis optimum yield from each fishery.").  As a result, the Service in its briefing "agrees that it is still bound by the requirement to accurately monitor sector operations."  Def. Reply at 12.  The Framework and the prior regulations, therefore, are consistent on this point.

### 3. *Deeming*

Oceana also contends that there is a procedural flaw with the regulations executing Framework 48.  Under the Act, the Council must "deem[]" new regulations "necessary or appropriate" before sending them to the Service for review.  16 U.S.C. § 1853(c).  The Service must then "evaluat[e]" the "proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, . . . and other applicable law."  Id. § 1854(b).  If they are, then the Service must "publish such regulations in the Federal Register, with such technical changes as may be necessary for clarity and an explanation of those changes."  Id.  In other words, in this context the Service may not write new regulations wholesale; rather, it has only the ministerial duty of translating the Council's language into clear regulatory text.  The Council, on the other hand, must officially "deem" all regulations "necessary or appropriate."  Id. § 1853(c).

Here, Oceana contends that the regulations published were so different from the Council's Framework that no "deeming" took place.  Plaintiff insists, moreover, that even though

the Service resubmitted the altered regulatory language to the Council for official "deeming," the Council's response was not formal enough to satisfy the demands of the Act.

To begin with, the Court cannot say that the regulatory language ultimately published by the Service differed in any appreciable way from the language the Council employed in Framework 48. Oceana first complains about what is <u>not</u> in the regulation. It notes that the Framework mentioned terms like "accuracy," "precision," and "bias," while those terms are not found in the Minimum Coverage Regulation itself. <u>See</u> Framework Adjustment 48 at 50, 386 (AR 26,091, 26,427). Those terms, however, appear only in prefatory paragraphs in the Minimum Coverage section and in the Environmental Analysis, not in any text destined for publication in the Federal Register. As the Service notes, the "<u>only</u> change that the Council proposed in Framework 48 for th[e] coverage standard was the clarification that the standard of precision – the 30% coefficient of variation – 'must be met for each stock at the overall stock level.'" Def. Reply at 8 (citing Framework Adjustment 48 at 50 (AR 26,091)). And that is what was published in the Federal Register. The omission or translation of other prefatory language is par for the course in writing regulatory text. Accuracy and bias, moreover, are both addressed in the Goals and Objectives Regulation, and those goals must be taken into account when setting coverage levels. <u>See</u> Framework 48 at 49-50 (AR 26,090-91). This, too, addresses Oceana's concern.

Oceana next complains about what <u>is</u> in the regulation. After clarifying the CV standard, the Service added that monitoring coverage must be sufficient "to monitor sector operations, to the extent practicable, in order to reliably estimate overall catch by sector vessels." Oceana argues that this language "had no referent in" the text of Framework 48. Ironically, however, that clause seems to paraphrase the very language on accuracy and precision whose loss Oceana

laments; it contains no real substantive additions.  See, e.g., Framework 45 Final Rule, 76 Fed.

Reg. 23,042, 23,056 (Apr. 25, 2011) ("[The Service] may only approve or disapprove measures

proposed in a . . . framework action, and may not change or substitute any measure in a

substantive way.").  As a result, the Court cannot say that the Service performed any task beyond

the "mere translation of Council-approved substance into formal regulatory language," which

does not necessarily require additional deeming.  Fishing Co. of Alaska v. Gutierrez, 510 F.3d

328, 332 (D.C. Cir. 2007).

Even if additional deeming were required, the Service did in fact submit the slightly

altered regulatory language to the Council for approval, and the Council yet again deemed the

regulations "necessary or appropriate."  The proposed regulatory text was sent by the Service to

the Council, with any changes – including the changes previously noted – either highlighted in

bright yellow or marked with a comment in the margin.  See Draft Framework 48 Regulations

for NEFMC Deeming at 39 (Mar. 8, 2013) (AR 20,487).  The Council Chair then reviewed the

proposed regulatory text and "deem[ed]" it "consistent with the framework text and the

Council's intent."  Letter from Rip Cunningham to John Bullard Regarding Catch Accounting

(Mar. 13, 2013) (AR 20,960).  The Council's Practices and Policies delegate responsibility for

deeming to the Council Chair.  See NEFMC Operations Handbook, Practices & Policies at 65

(rev. July 2012) ("[T]he Council Chair, on behalf of the full Council, shall make the

determination to deem the draft proposed regulations as necessary and appropriate for the

purposes of implementing the action, consistent with section 303(c) of the [Magnuson Act].").

Because the changes at issue were clearly highlighted and flagged, and because the "deeming"

task was delegated by the full Council to the Council Chair, the Court cannot say that this

procedure contravened the law.  Compare with Fishing Co. of Alaska, 510 F.3d at 331-33

(regulation not properly deemed where changes were not flagged, Council never had opportunity to approve changes, and Council staff – rather than a delegated Council member – allegedly did the deeming). The Court, accordingly, finds that the regulations were properly deemed.

* * *

In issuing its final regulations, the Service also claimed that it had the authority to issue portions of the new rules under 16 U.S.C. § 1855(d), which allows the Service itself to "promulgate such regulations . . . as may be necessary" to "carry out any fishery management plan." No deeming is required by the Council under 16 U.S.C. § 1855(d). Oceana asserts that the regulations are not "necessary" and do not "carry out" the Plan or Amendment 16. Because the Court has already found that Defendants had the ability to implement the Framework under 16 U.S.C. § 1854(b), however, it is not necessary to address the Service's alternative argument.

B. <u>Magnuson-Stevens Act</u>

Oceana next contends that Framework 48 violates the Magnuson-Stevens Act's broader conservation provisions. Specifically, Plaintiff asserts that the Plan no longer "ensure[s] accountability" with annual catch limits thanks to the Framework Adjustment. 16 U.S.C. § 1853(a)(15). Oceana also alleges that the Framework violates the National Standards by prioritizing cost concerns over the environment.

1. *Ensuring Accountability*

Plaintiff's first contention is that, by clarifying which portion of catch the CV standard applies to, the Service somehow undermined its entire accountability system. Like pulling an ace from the foundation of a house of cards, the alteration of this one detail will purportedly cause the entire catch-limit system to tumble. Oceana, however, severely exaggerates the impact of Framework 48 on the Plan's accountability scheme.

To begin with, the Court reiterates that the CV adjustment in Framework 48 was a mere clarification. That is, if Amendment 16 properly "ensure[d] accountability" before the adjustment – which this Court held that it did, save some special measures required for five stocks of fish – then it presumably still ensures accountability today. See Locke, 831 F. Supp. 2d 95. After all, as was the case in Amendment 16, compliance with the CV requirement remains a floor for setting monitoring levels; that is, the Service may well demand greater coverage if necessary to enforce catch limits. See 50 C.F.R. 648.87(b)(1)(v)(B)(1)(i). And the Service is obligated to consider the goals of the program – including improving documentation of catch – when setting coverage levels at or above the bare minimum set by the CV standard. See id.; Framework 48 at 49 (AR 26,090). The ASM program is also not the sole method of monitoring compliance with ACLs. As in Amendment 16, Sectors are still required to self-report catch, as are vendors who purchase catch from sectors. See 78 Fed. Reg. at 25,606. And there is added incentive for vessels to accurately self-report. If the sector exceeds its ACE for a stock because one or more vessels under-report, all the vessels in the sector are jointly and severally liable for the overage. See id. at 25,608. The sector would thus have an incentive to detect and discipline under-reporting vessels. All of these checks on exceeding ACEs remain and will still aid in ensuring accountability with ACEs and ACLs.

In addition, the Council rightly observed that the CV requirement is not, in the grand scheme of things, all that determinative of whether the fishery meets its ACLs. See Framework 48 at 388 (AR 26,429) ("a change in CV has relatively little effect on the difference between nominal catch and the true catch"). Instead, the Council found that two other factors have a much larger impact on the likelihood of ACLs being exceeded. See id. ("the most important factors would be discards as a percent of catch and bias, and not CV"). The first of these factors

is the percent of overall catch composed of bycatch. If this proportion were large, then discards would need to be monitored both very accurately and very precisely to ensure compliance with ACLs. See id. at 387, 391-92 (AR 26,428, 26,432-33). In other words, the CV standard, which measures precision, would become much more important. Bycatch, however, is a relatively small portion of overall catch for most stocks. See Summary Report at 9 (AR 25,805) ("[T]here is a trade-off when costs are considered in terms of the associated increase in precision because the amount of total discard generated in strata with limited activity is minor in terms of pounds of fish discarded."); id. at 10-12 (AR 25,806-08) (showing discards as percent and pounds of catch). Given the small percentage of catch composed of bycatch, measuring it very precisely did not concern the Service.

Observer bias is the second factor that could tip the scales and cause ACLs to be exceeded. Such bias is the difference between discard rates on observed trips, where vessels tend to fish for short periods of time and discard fewer fish, and unobserved trips, which tend to last longer and produce more discards. See Summary Report at 68 (AR 25,864). Although the Council does not know exactly what level of bias the observer programs create – one estimate puts it between one and four percent – it is very confident that bias will not cause the fishery to exceed its ACLs. See id. at 67 (AR 25,863) (estimate that bias is around 1-4%). For example, even if the level of observer bias is two hundred percent, it remains unlikely that a sector will exceed its ACE unless the sector is already fast approaching that limit. See Framework 48 at 392 (AR 26,433).

Even factors that have a greater impact than the CV, then, are unlikely to cause the fishery to exceed its ACLs based on the Council and Service's appraisal. If this is true, the CV standard as clarified by the Council is also unlikely to cause ACL overages. Given the level of

22

deference courts pay to agencies' expert data analysis, the Court credits those calculations. Kennecott Greens Creek Mining Co., 476 F.3d at 956; see also Int'l Bhd. of Teamsters, 724 F.3d at 216. Clarification of the CV standard alone, in sum, is unlikely to cause the fishery to shirk accountability and barrel past its ACLs.

The Service's confidence that overfishing will not occur is also possible, in part, because Defendants include a buffer between the fishery's maximum acceptable catch and the sub-ACLs it allocates to sectors. See 78 Fed. Reg. at 25,606 ("significant additional uncertainty buffers are established in the setting of ACLs that help make up for any lack of absolute precision and accuracy in estimating overall catch by sector vessels"). That buffer guards against statistical uncertainties such as, for example, the unknown level of observer bias created by at-sea monitoring or a relatively generous CV. Cf. id. While Oceana criticizes what it sees as the Service's over-reliance on these buffers, the Court finds that they are yet another reasonable measure taken to ensure accountability and prevent overfishing.

Overall, the Council's expert estimated that there is 97.5% probability that the sectors' combined ACE will not be unwittingly exceeded if the 30% CV is applied at the stock level. See Framework 48 at 387, 391-92 (AR 26,428, 26,432-33). This assumption holds as long as sectors are not rocketing toward their ACE or suddenly discarding a much larger percentage of fish. See id. 386-93 (AR 26,427-34); see also Summary Report at 77-83 (AR 25,873-79) (bias is also unlikely to impact compliance with ACLs). That is, under Framework 48, there is only a 2.5% chance that sectors would surpass their combined ACE if conditions in the fishery remain roughly the same as in previous years. This is surely sufficient to "ensure accountability" with ACLs and satisfy the demands of 16 U.S.C. § 1853(a)(15).

## 2. *National Standards*

Oceana additionally argues that Framework 48 violates the Act's National Standards by prioritizing cost over conservation. See, e.g., 16 U.S.C. § 1851(a)(1) ("Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."); id. § 1851(a)(2) ("Conservation and management measures shall be based upon the best scientific information available."). If the issue sounds familiar, that is because the Court addressed it in Section III.A.1, when considering consistency with Amendment 16. As the Court noted in that context, nothing in the Framework elevates economic efficiency over environmentalism. Even the National Standards require the Service and the Council to take cost into account, all environmental impacts being equal – and Framework 48 merely echoes this prescription. See, e.g., 16 U.S.C. § 1851(a)(7) ("minimize costs and avoid unnecessary duplication"); id. § 1851(a)(8) ("minimize adverse economic impacts"). The Framework, therefore, complies with the National Standards.

## C. APA

Oceana next contends that the Service violated the APA by changing its position without explaining the reversal or "reasons for the new policy." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Plaintiff tethers this argument to the deletion of the requirement to "accurately monitor sector operations." 50 C.F.R. § 648.87(b)(1)(v)(B)(3)(ii) (2011). As previously explained, however, see Section III.A.2, *supra*, Framework 48 itself still contains an accuracy requirement, and the Service agrees that Defendants are bound to monitor sectors accurately. There was, accordingly, no reversal to explain.

D.  2013 Sector Operations Rule

Finally, Oceana challenges the Service's ultimate decision to set monitoring levels at 22% in its 2013 Sector Operations Rule.  See 78 Fed. Reg. at 25,597.  Under the APA, Plaintiff asserts, an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Oceana claims that the Service violated this principle when determining coverage levels for the 2013 fishing year.

1.  *Improper Assumptions*

First, Oceana argues that the Service's prediction ran "counter to the evidence before" it when it assumed that it would actually meet the 22% coverage target.  Id.  Plaintiff points out that, in the past, the Service has not met its targets: in both 2010 and 2011, for example, the Service projected 38% coverage and achieved 32% and 27% coverage, respectively.  See 75 Fed. Reg. 18,126; 78 Fed. Reg. at 25,597; Summary Report at 12 (AR 25,808); Pl. Mot. at 7.  In the past fishing year, at the time of briefing, coverage was set at 25% but had actually reached only 22%.  See 78 Fed. Reg. at 25,597; Pl. Mot., Exh. 1 (Northeast Fisheries Observer Program, Preliminary Estimate of Groundfish Observer/At-Sea Monitor Coverage Rates (Mar. 5, 2013)).  Oceana claims that it was unreasonable to disregard this achievement gap.

The Service counters that, even though it did not explicitly discuss the gap, it did account for both coverage gaps and a broad array of other statistical uncertainties when it made its decision.  Indeed, the Service took pains to utilize the most cautious estimates when setting monitoring levels.  To begin with, the Service used the most conservative data on past fishing

years when making its projections, rather than averaging the data for better and worse years.  See Summary Report at 13-18 (AR 25,809-14).  The Service then used that worst-case data to predict a coverage level that would achieve a 30% CV for all stocks in the fishery, basing that level on the most sensitive stock, GB winter flounder.  See id. at 15 (AR 25,810).  Every other stock could have been monitored at a rate ten percentage points lower while still meeting the CV, but the Service decided to use the higher coverage level for all stocks to generate more reliable estimates of discards.  See 78 Fed. Reg. at 25,608 ("The Council expressed concern that the 22-percent coverage rate for FY 2013 is based on achieving the 30-percent CV for GB winter flounder, and that the coverage rate is therefore 10 percentage points higher than necessary to achieve the CV standard for all other stocks.").  In addition, as the Court observed earlier, the sub-ACLs actually allocated for the fishery are buffered below the maximum biologically acceptable catch to compensate for uncertainties like the possible disparity between planned and actual coverage.  See 78 Fed. Reg. at 25,606.  Giving great weight to the Agency's expert scientific analysis and projections regarding the coverage necessary to meet the 30% CV and ACLs,  the Court, accordingly, finds that it was not arbitrary to conclude that 22% projected coverage would meet the Service's goals, even given uncertainties like the coverage gap.

Next, Plaintiff contends that the Service "failed to consider" observer bias by assuming that the bias was zero in its calculations, despite evidence to the contrary.  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.  Oceana also contends that, due to this year's relatively low ACLs, bias may be particularly bad in 2013.  Of course, the Service has acknowledged that observer bias exists.  See Summary Report at 68 (AR 25,864).  Based on available data, however, it has not been able to determine the extent of such bias, although current information points to a very low level.  See id. at 67-68 (AR 25,863-64).  The Court, therefore, cannot fault the agency for

assuming zero bias in its CV calculations, especially because it later ran the numbers to ensure that sectors would not surpass the fishery's ACLs, even with exorbitantly high levels of bias. See id. at 77-103 (AR 25,873-99). Those actions were reasonable and do not violate the APA.

2. *Misapplied Legal Standards*

Oceana proceeds to argue that the Service misapplied the relevant standards and hence acted arbitrarily. For a start, Plaintiff asserts that the Service treated the 30% CV standard as the presumptive standard for coverage, rather than as the bare minimum. The Service, however, permissibly began with the 30% CV as its baseline and then determined what coverage level would reliably estimate catch without requiring unnecessary expenditures. See Summary Report at 13-23 (AR 25,809-19); 78 Fed. Reg. at 25,597, 25,606. Using the CV standard as a baseline violates neither the Amendment, the Framework, nor the APA.

Oceana also complains that the Service erred by considering National Standards 7 and 8 when setting coverage levels. This is an odd argument, to say the least, since all Plans and regulations are subject to and must comply with the Act's National Standards. Standard 7 calls for the Service to "minimize costs and avoid unnecessary duplication" where practicable. 16 U.S.C. § 1851(a)(7). The Service found that reducing costs was "practicable" by setting the coverage standard at 22% – it did not also need to find, as Plaintiff argues, that doing so was "necessary." Standard 8 requires, among other things, that "to the extent practicable," the Service "minimize adverse economic impacts on [fishing] communities." Id. § 1851(a)(8). Again, the Service did just that by, for example, setting coverage at a level low enough that all monitoring costs could be covered by the Government for fishing year 2013. See 78 Fed. Reg. 25,597. Both Standards are relevant, and the Service properly took them into account.

### 3.   *Reliably Estimating Catch*

In Oceana's final attempt to undermine the 22% coverage decision, it contends that, assuming Framework 48 is valid, the coverage level will not "reliably estimate" catch, as the Framework's new regulations require.  See 50 C.F.R. § 648.87(b)(1)(v)(B)(1)(i) (coverage must be sufficient to "monitor sector operations, to the extent practicable, in order to reliably estimate overall catch by sector vessels").

First, Plaintiff argues that the Service did not ensure that catch estimates would be both "timely" and "reliable" throughout the fishing season.  Nothing in the Service's policies or procedures, however, has changed in a way that would render its estimates less than timely. Coverage is still assigned randomly over the course of the fishing season, and sectors must still log their catch each week until they near their ACE, and must log catch each day after that.  See Summary Report at 18, 226 (AR 25,814, 26,022); 78 Fed. Reg. at 25,609-10.  No additional explanation of timeliness was required.

Next, Oceana asserts that too many pounds of discards will be estimated at a CV higher than 30%.  Yet, as explained above, the Service has reasonably and persuasively explained why all stocks will be tracked at a CV of 30% or lower given a 22% coverage level.  See Summary Report at 13-23 (AR 25,809-19).  In addition, the Court has already outlined the multiple safeguards – such as self-reporting, reporting by vendors, and sanctions for misreporting – that help to ensure the reliability of data on sector catch.  This argument, which essentially rehashes the argument that the Framework does not "assure accountability," holds no more water in this context than when raised earlier.

Finally, Plaintiff argues that, because certain stocks nearly met the combined ACE for sectors in 2011, coverage should be higher rather than lower this year.  Oceana emphasizes that,

due to continued overfishing, the ACLs this year are set lower than usual, so coverage for these stocks should be more rather than less comprehensive.  See Framework 50 Interim Final Rule, 78 Fed. Reg. 26,172, 26,181-83 (May 3, 2013) (setting ACLs and sub-ACLs for 2013); Framework 48 at 158-59 (AR 26,199-200) (combined ACEs for 2010 and 2011).  What Plaintiff ignores is that none of the ACEs was actually exceeded in 2011 – let alone the ACL.  See Framework 48 at 158-59 (AR 26,199-200).  The Service has reasoned persuasively that slightly lower coverage will also produce compliant results, even with lower ACLs.  The Court, accordingly, cannot call the Service's action arbitrary.

## IV.  Conclusion

Because the relevant portions of Framework 48 and the 2013 Sector Operations Rule comply with the Magnuson-Stevens Act and pass APA review, the Court will grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:  February 18, 2014